# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 13-473

STATE OF LOUISIANA

VERSUS

COREY W. OLIPHANT

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C9650
HONORABLE ERIC R. HARRINGTON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and J. David Painter, Judges.

**REVERSED AND RENDERED.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Corey W. Oliphant**

**Van H. Kyzar**
**District Attorney**
**Charles W. Seaman**
**Assistant District Attorney**
**Tenth Judicial District**
**P. O. Box 838**
**Natchitoches, LA 71458-0838**
**(318) 357-2214**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**PETERS, J.**

The defendant, Corey W. Oliphant, appeals his conviction of armed robbery, a violation of La.R.S. 14:64, which is before this court for a third time. For the following reasons, we vacate the conviction and sentence and enter a verdict of not guilty.

## PROCEDURAL HISTORY

The criminal charge before us arises from the April 23, 2005 armed robbery of the Tobacco Warehouse, a Natchitoches, Louisiana business establishment. The defendant and his brother, Nicholas Andre Oliphant, were ultimately charged by bill of information with the offense. After a two-day trial beginning January 16, 2007, a jury convicted both of the defendants as charged.[1] On April 9, 2007, the trial court sentenced the defendant to serve forty years at hard labor and ordered that the sentence be served without the benefit of parole, probation, or suspension of sentence. The defendant did not file a motion for reconsideration of his sentence.

The defendant appealed his conviction and sentence, and this court affirmed both. *State v. Oliphant*, 07-1210 (La.App. 3 Cir. 4/30/08) (unpublished opinion), *writ denied*, 08-1324 (La. 5/22/09), 9 So.3d 133. On April 20, 2010, the trial court rejected the defendant's post-conviction-relief application, and the matter returned to this court via a writ for review of the trial court's judgment, which was denied. *State v. Oliphant*, 10-585 (La.App. 3 Cir. 2/23/11) (unpublished writ), *writ denied*, 11-592 (La. 3/2/12), 83 So.3d 1038.

---

[1] While the brothers were tried together, this appeal is limited to the review of Cory W. Oliphant's conviction.

The defendant then sought relief from the federal court system, and, on March 8, 2013, the United States District Court for the Western District of Louisiana issued the following order:

> IT IS ORDERED that Corey Oliphant is *GRANTED A CONDITIONAL WRIT OF HABEAS CORPUS, ORDERING HIS DISCHARGE FROM CUSTODY* on Ground Number 8 of his habeas petition *unless*, **within 60 days from the date of the order**, the State of Louisiana reinstates Corey Oliphant's right to directly appeal his conviction with the assistance of counsel and affords him the opportunity to obtain court-appointed counsel for his appeal.

*Oliphant v. Warden, La. State Penitentiary*, No. 1:12-cv-0899, 2013 WL 951610, at * 1 (W.D. La. March 11, 2013).

In compliance with that order, the trial court executed an order on March 14, 2012, allowing the defendant "to directly appeal his conviction of 1/17/2007 and that the Louisiana Appellate Project is appointed to represent him in this appeal[.]"  This appeal arises from that trial court order.

## DISCUSSION OF THE EVIDENTIARY RECORD

At approximately 2:00 p.m. on April 23, 2005, a man armed with a pistol entered the Tobacco Warehouse Convenience Store in Natchitoches, Louisiana, and took approximately $700.00 from the store employees at gunpoint.  Jared Bennett, the clerk on duty at the time of the robbery, described the man as a black male wearing black pants and a hooded, dark sweatshirt, with the hood pulled up over his head.  He further noted that the man wore a "piece of cloth, kind of like a neck gator" over his face.  His co-worker, Julie Beard, described the robber as a black male in his early twenties, with brown eyes and short hair, but with no facial hair that she observed.  She stated that the robber was dressed in black with a hooded sweatshirt and a "black wrap" around his chin.

At approximately the same time as the robbery, Riley Stanfield, a retired detention officer, who lives on the street immediately behind the strip mall where

2

the Tobacco Warehouse is located, was working in his yard. He observed a man, dressed in a dark sweatshirt with the hood pulled up over his head, run through his yard, jump a fence, and get into the passenger side of a white, older-model Lincoln automobile, which was parked approximately 150 to 200 yards from his location. He observed that the man had something in his right hand, but could not identify the object. Additionally, he was able to see that a black male was sitting in the driver's seat of the Lincoln. Although the driver's face was not covered or disguised, Mr. Stanfield could not provide the investigating officers with a physical description of either man. With regard to the vehicle itself, Mr. Stanfield did note that the molding below the bottom of a door was missing.

While on patrol at approximately 4:00 p.m. that same afternoon, Natchitoches City Police Officer Joel Mitchell[2] observed the driver of a white Lincoln Town Car run a stop sign. Being aware of the robbery and the description of the vehicle involved,[3] Officer Mitchell attempted to initiate a stop for the traffic violation. He followed the vehicle as the driver made an apparent attempt to escape, but ultimately caused the driver to stop. The vehicle was missing the molding below the bottom of a door; was being driven by Nicholas Oliphant (Nicholas), the defendant's brother; and was registered to Odell Oliphant, the defendant's father. Officer Mitchell asked Nicholas if he had a gun in the vehicle and, after some hesitation, he admitted that he did. Officer Mitchell then took Nicholas into custody, handcuffed him, and retrieved a nickel-plated, snub-nosed, twenty-two caliber revolver from the Lincoln. Officer Mitchell identified the

---

[2] At the time of the trial, Officer Mitchell was employed by the Natchitoches Parish Sheriff's Office.

[3] Officer Mitchell testified that he had been informed that the vehicle involved in the armed robbery was a "Lincoln Town Car." Mr. Stanfield had only described the vehicle as an "old model Lincoln." Additionally, while questioning Officer Mitchell, counsel for the state described the vehicle as a "Continental."

weapon he took from Nicholas at trial, stating that the pistol was easily recognizable because it had the distinctive characteristic of being a nickel plated pistol with a blued cylinder.

Natchitoches City Police Officer Damien Spillman[4] interrogated Nicholas when he was brought to the police station. According to Officer Spillman, Nicholas told him that he had been home all day and that his brother (the defendant) could verify that fact. Officer Spillman then went to the defendant's house and asked him to return to the police station with him. The defendant agreed, stating that he was about to go to the station because he had heard that his brother was in custody. Officer Spillman stated that initially when questioned concerning his activities earlier that day, the defendant told him that he had worked the night shift and then had slept most of the day. However, Officer Spillman testified that when they arrived at the police station, the defendant changed his story to say that he had not worked the night before but had stayed out late; that he had gotten up at 10:30 a.m.; and had gone to a friend's house to cut hair. According to Officer Spillman, the defendant said that he left the friend's house a few minutes after 11:00 a.m. in order to retrieve another set of clippers. He said that he then returned to the friend's house, where he continued cutting hair until he heard of his brother being arrested.

Officer Spillman testified that he decided to call for a set of tracking dogs to assist in the investigation after the defendant told him that he had not seen his brother the entire day. While interrogating the defendant, Officer Spillman asked him to provide a sock off his foot, and the defendant complied with the request. Before requesting the sock, Officer Spillman had already telephoned the

_____

[4] At the time of trial, Officer Spillman was no longer working in law enforcement.

4

Natchitoches Parish Detention Center (Detention Center) and requested that a tracking team be brought to the Tobacco Warehouse.

Natchitoches City Police Officer Jeff Franks testified that he observed Officer Spillman's interrogation of Nicholas, and he heard Nicholas tell Officer Spillman that he and the defendant left home that morning to pick up some cigarettes for their mother, after which they returned home. He later asked the defendant about the trip to obtain cigarettes, and the defendant acknowledged the trip, but suggested that he and his brother had gone to a store different from the one identified by Nicholas. On cross-examination, however, the officer was provided his previous written statement, which suggested that the trip to pick up the cigarettes occurred the night prior to the robbery.

Officer Spillman took the defendant's sock to the Tobacco Warehouse and gave it to Officer Roy Gallien, one of the Chase Team dog handlers assigned to the Detention Center, who was waiting with two bloodhounds. Officer Gallien testified that his position with the Detention Center required that he "transport inmates[] and work the Chase Team Bloodhounds." According to Officer Gallien, the Detention Center has six tracking dogs including "Bo" and "Trusty," the dogs used in this search, as well as a number of puppies in training. He testified that "the mamma dog" came from Angola State Prison and that she had been bred to dogs from two other correctional facilities around the state. The dogs are not certified in any capacity, and all of their tracking expertise has arisen from use at the Detention Center. While Officer Gallien testified concerning at least two situations where the bloodhounds were useful in a search, he provided no information concerning the expertise of anyone involved in the training, including

5

himself.[5]  Additionally, he acknowledged that the Detention Center keeps no records concerning the dogs' use.

With regard to the use of the bloodhounds in the instant case, Officer Gallien testified that he let the two dogs sniff the sock provided by Officer Spillman at approximately 7:15 p.m. the evening of the robbery, and, at that time, he was not aware that the robbery had occurred at 2:00 p.m.  Still, he suggested that this was an adequately fresh scent.  After providing each dog with the scent, Officer Gallien and his two team members began tracking from the store to where they were told the perpetrator got into the Lincoln.  Each dog tracked separately from the other and, according to Officer Gallien, each dog tracked along a route similar to what he would later learn was the route described by Mr. Stanfield.

After considering the results of the bloodhound search, Officer Spillman returned the defendant's sock to him and later arrested him for the offense of armed robbery.  The next day, he searched the Lincoln and seized two items made of a panty-hose or stocking-type material found in the floorboard of the back seat.  At a later time, the officers obtained a search warrant for the defendant's house, but the execution of that search warrant resulted in the seizure of no evidence.  Specifically, the officers were unable to find any clothing resembling that worn by the robber nor did they find any evidence of money that might have been taken from the Tobacco Warehouse.

As the investigation progressed, Mr. Bennett, Ms. Beard, and Mr. Stanfield were all shown a photographic lineup containing, among other photographs, pictures of both Nicholas and the defendant.  While it is significant to note that the pictures of the defendant and his brother were twice the size of the other four

---

[5] In fact, Officer Gallien testified that the trustees at the Detention Center were responsible for training the dogs.

6

photographs used in the lineup, none of the three individuals identified either the defendant or his brother as the two men involved in the robbery. Not only could Mr. Bennett not identify anyone in the lineup as being the individual who robbed him, but when asked to "guess or . . . take your best shot," he identified someone other than either of the brothers. Ms. Beard also picked someone other than the defendant brothers, and Mr. Stanfield could not identify anyone. At trial, none of the three individuals could identify either defendant as the one who committed the armed robbery.

Both Mr. Bennett and Ms. Beard testified at trial that the pistol seized by Officer Spillman appeared to be similar to the one used by the robber, but both testified that they could not make a positive identification because their view of the weapon was obscured by the robber's sleeve and/or hand during the robbery. When questioned at trial concerning the distinctive nature of the pistol,[6] Mr. Bennett stated that he was not able to see the gun's cylinder during the robbery. He further acknowledged his previous testimony in which he admitted that he told Officer Spillman that the seized gun was not the one used in the robbery.

Finally, Pat Wojtkiewicz, a technical director for the North Louisiana Crime Laboratory (Crime Lab) and an expert in DNA analysis, testified that the pistol and nylon-stocking material found in the Lincoln were tested by the Crime Lab for the presence of DNA. According to Mr. Wojtkiewicz, the analysis of the trigger and cylinder grip of the pistol produced an insignificant amount of DNA with which to work, and the DNA derived from the grip and hammer of the gun "was consistent of being a mixture of more than one individual, at least two or three individuals." He stated that Nicholas could not be excluded as one of the donors of that DNA.

---

[6] Reference was made by counsel for the state to Officer Mitchell's observation that the blued cylinder on the chrome pistol was extremely unusual.

With regard to the nylon-stocking material, Mr. Wojtkiewicz testified that the DNA profiles obtained contained "mixtures of at least two individuals." With respect to the findings, Mr. Wojtkiewicz stated that the defendant could not be excluded as a major contributor and Nicholas could not be excluded as a minor contributor. In both analysis results, Mr. Wojtkiewicz testified that when he used the word "excluded," he was suggesting that over ninety-eight percent of the population was excluded as a contributor to the DNA sample.

## ASSIGNMENTS OF ERROR

In this latest appeal, the defendant raises five assignments of error:

### I.

The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a reasonable doubt the identity of Corey Oliphant as a participant or a principal in the robbery.

### II.

The trial court erred in failing to assure that discussions and arguments of counsel made during sidebar discussions were recorded and preserved for appellate review, thereby denying Appellant his constitutional right to a full appeal.

### III.

The trial court erred in permitting the testimony of Officer Gallien regarding the bloodhounds, as the evidence was unreliable and in violation of Appellant's constitutional rights, among these his Sixth Amendment right to full cross-examination of his accusers.

### IV.

The trial court erred in admitting into evidence the testimony of Pat Wojetkiewicz [sic], in violation of Appellant's right to confront his accusers as guaranteed to him by the Sixth Amendment of the United States Constitution.

8

# V.

Corey Oliphant was denied his Sixth Amendment right to the effective assistance of counsel at all stages of this case.

## OPINION

The United States District Court for the Western District of Louisiana based its grant of a conditional writ of habeas corpus on Claim Number Eight of the defendant's Application for Post Conviction Relief. That particular claim addressed the defendant's complaint that he had been denied effective assistance of appellate counsel in his appeal. It appears that after their conviction, the brothers' father retained the services of two lawyers, who were subsequently suspended from the practice of law during the appellate process, but not before having filed a skeleton brief with this court. This court gave the brothers ten days in which to retain new counsel, but they could not do so because all the family assets had been spent on the initial representation. As a result of their financial inability to retain new counsel for the purpose of briefing the issues to be presented to this court, the skeleton brief was all they were left with, and this court, considering the record and the briefs before it, affirmed both convictions. The matter is now before us in compliance with the federal court's March 11, 2013 order.

The defendant was convicted of the offense of armed robbery, a violation of La.R.S. 14:64. "Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La.R.S. 14:64(A). Additionally, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La.R.S. 14:24. However,

9

the statutory rule concerning principals has some qualifications. Only those persons who knowingly participate in the planning or execution of a crime are principals.[7] *State v. Knowles*, 392 So.2d 651 (La.1980). Therefore, "[m]ere presence at the scene is therefore not enough to 'concern' an individual in the crime." *State v. Pierre*, 93-893 (La. 2/3/94), 631 So.2d 427, 428.

There is no dispute but that an armed robbery of the Tobacco Warehouse occurred on the afternoon of April 23, 2005, and the only issue on appeal is the identity of the individual or individuals who committed the offense. There exists no eyewitness identification of the individual who robbed the Tobacco Warehouse. In fact, when confronted with a rather suggestive photographic lineup, two of the three individuals, who saw the actual robber on that day, picked someone other than either of the two brothers. A search of the defendants' home found no physical evidence to link them to the robbery, and the money that was stolen was never recovered. Although there is some evidence linking Nicholas to the armed robbery,[8] no similar evidence exists connecting the defendant. The entire case against the defendant is based on the bloodhound tracking results, the DNA-test results, and the alleged inconsistent statements by the defendant and his brother to the law-enforcement officers.

In his first assignment of error, the defendant asserts that the evidence presented by the state was insufficient to establish beyond a reasonable doubt that he was a participant or principal in the robbery. This assignment of error overlaps

[7] The state made no effort to present evidence to establish which brother actually committed the robbery and which was the driver of the Lincoln. However, in closing arguments to the jury, the state asserted that the defendant committed the actual robbery based on the bloodhound evidence.

[8] Nicholas was apprehended while fleeing from a law enforcement officer in a vehicle which matched the description of the one used by the perpetrators in the armed robbery; he was found in possession of a pistol similar to the one used in the robbery; and panty-hose material similar to the mask worn by the individual who directly committed the robbery was found in his vehicle.

with the defendant's third and fourth assignments of error, and these will be considered together.

Our standard of review in a sufficiency of the evidence claim is well-settled. We must determine "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007). This standard, commonly referred to as the *Jackson* standard of review, is derived from *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), and is now legislatively embodied in La.Code Crim.P. art. 821.

The *Jackson* standard does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521. Stated another way, the appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact[,]" but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727.

In attempting to determine whether the state carried its burden of proof, we also note that the evidence against the defendant is all circumstantial. Louisiana Revised Statutes 15:438 states that "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."

11

> As an evidentiary rule, that statute restrains the fact finder in the first instance, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and, second, to convict only if every reasonable hypothesis of innocence is excluded. Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law.

*State v. Wade*, 33,121, pp. 1-2 (La.App. 2 Cir. 5/15/00), 758 So.2d 987, 990, *writ denied*, 00-2160 (La. 9/28/01), 797 So.2d 684.

In cases where the accused asserts that he was not the person who committed the crime, the *Jackson* rational requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. *State v. Johnson*, 38,927 (La.App. 2 Cir. 11/23/04), 887 So.2d 751. Thus, the issue before this court is whether the jury, while viewing the evidence in a light most favorable to the state, could have found that all reasonable hypotheses of innocence were excluded. *State v. Dotson*, 04-1414 (La.App. 3 Cir. 3/2/05), 896 So.2d 310.

We find no error in the trial court allowing the investigating officers to testify concerning the perceived inconsistent statements from both the defendant and his brother. There is no evidence to suggest that the statements were not voluntary, and conflicting voluntary statements made to law enforcement officers can be indicative of a guilty mind. *State v. Wiley*, 03-884 (La.App. 5 Cir. 4/27/04), 880 So.2d 854, *writ denied*, 04-1298 (La. 10/29/04), 885 So.2d 585. Still, standing alone, conflicting statements are not sufficient for the state to overcome its burden of proof, and the remainder of the proof must be analyzed to determine if, when all of it is considered together, it meets the evidentiary standard of proof beyond a reasonable doubt.

The next aspect of the state's proof relates to the bloodhound-tracking evidence. Not only does the defendant assert that it was insufficient to satisfy the state's burden of proof, but in his third assignment of error he argues that it should

have been excluded as it violated his constitutional right to confront his accusers. Specifically, he asserts that nothing at trial was presented to establish Officer Gallien's expertise in evaluating and handling bloodhounds and that a proper foundation for the admissibility of the bloodhound evidence was not laid.

As previously noted, the state offered no evidence of the certification of the two dogs involved in the tracking, and the only evidence of training was Officer Gallien's testimony to the effect that much of the dogs' training was accomplished by inmates at the Detention Center. Officer Gallien was not offered as an expert in the handling of bloodhounds, and the record contains no evidence of his training or the training of anyone else associated with the dogs. While Officer Gallien did testify to incidences of successful use of the bloodhounds, he acknowledged that no records were kept concerning the success or failure rate of operations involving the bloodhounds. When the defendant objected to Officer Gallien's testimony and lack of expertise and documentation, the trial court overruled the objection, noting that the objection would go to the weight of the evidence instead of its admissibility.

The defendant argues to this court that there exists no evidence in this record to establish that bloodhound tracking is scientifically recognized or accepted in the scientific community. We acknowledge that the record does not contain such evidence, but note that while bloodhound evidence is an uncommon occurrence, it has been used in prior prosecutions. At the same time, while noting that bloodhound evidence is an uncommon occurrence, we also note that evidence concerning the use of dogs in drug criminal investigations is not, and "a 'canine sniff' by a well-trained narcotics detection dog" has been determined by the United States Supreme Court not to be an unreasonable search pursuant to Fourth

Amendment of the United States Constitution. *U.S. v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637 (1983). Still, as pointed out in *State v. Jackson*, 96-1182, p. 8 (La.App. 3 Cir. 3/26/97), 692 So.2d 659, 664, *writ denied*, 97-1100 (La. 10/13/97), 703 So.2d 611:

> Generally, although courts in this state have not set forth the requirements needed to show that a drug dog is qualified to detect drugs, they have noted the qualifications of drug detection dogs when determining their actions in detecting drugs to be sufficient probable cause for a search. *See State v. Gant*, 93-2895 (La.5/20/94); 637 So.2d 396, *reh'g denied*, 93-2895 (La.7/1/94); 639 So.2d 1183 ("drug-certified" dog detected contraband); *State v. Dillon*, 95-00884 (La.App. 3 Cir. 1/31/96); 670 So.2d 278 (narcotics dog was "trained and certified"); *State v. Dickens*, 633 So.2d 329 (La.App. 1 Cir.1993) (dog and trainer certified by National Narcotics Detector Dog Association); *State v. Rose*, 607 So.2d 974 (La.App. 4 Cir.1992), *writ denied*, 612 So.2d 97 (La.1993) (dog was a "narcotics trained" dog); *State v. Philippoff*, 588 So.2d 778 (La.App. 4 Cir.1991) (dogs were "certified narcotics detection dogs"); *State v. DeBlanc*, 549 So.2d 1287 (La.App. 3 Cir.1989), *writ denied*, 558 So.2d 599 (La.1990) (record revealed drug detection dog had detected drugs in more than two hundred cases with the officer and had placed first nationally in vehicle searches).

The fact that bloodhound use in a criminal investigation is uncommon is supported by the lack of Louisiana jurisprudence on the subject of bloodhound certification. In the more recent cases where bloodhounds were used to track and locate perpetrators or victims, the bloodhounds' tracking capabilities were not raised on appeal. *See State v. Sparks*, 88-17 (La. 5/11/11), 68 So.3d 435, *cert denied*, ___ U.S. ___, 132 S.Ct. 1794 (2012); *State v. Ellis*, 42,520 (La.App. 2 Cir. 9/26/07), 966 So.2d 139, *writ denied*, 07-2190 (La. 4/4/08), 978 So.2d 325; and *State v. Harris*, 577 So.2d 220 (La.App. 1 Cir. 1991).

However, the certification issue did arise in *State v. Harrison*, 149 La. 83, 88 So. 696 (1921). In *Harrison*, two bloodhounds followed a trail from a window, through which a burglar had entered a house approximately fourteen hours earlier, to the defendant's home. Hearing the approaching bloodhounds, the defendant fled

his home by exiting from a window on the other side of the house. The only evidence connecting the defendant to the crime scene was the testimony of the bloodhounds' owner, and, in appealing his conviction, the defendant questioned the reliability of that testimony.

In reversing the defendant's conviction and remanding the matter for a new trial, the supreme court stated that the "[s]o-called bloodhound testimony is admissible in evidence against a person accused of crime," but its weight is "merely as a circumstance tending to prove his guilt." *Id.* at 697. After finding that such evidence is not admissible in some states, the court stated that in those states where it is admissible, the admissibility is based on the proof of certain criteria:

> [T]he rule is that it should not be admitted until a proper foundation has been laid, by some proof of the reliability of the dogs, their acuteness of scent and power or sense of discrimination, and, in that respect, their reputation for trailing criminals, their pedigree, training, etc. With all that, the text-writers on the subject doubt that any trial judge would allow a conviction to stand upon proof only of the trailing by bloodhounds.

*Id.*

In *Harrison*, the state had introduced copies of documents that purported to be registry and pedigree certificates of the dogs involved in the investigation. However, the supreme court found that the trial court erred in allowing them to be admitted because they were not authenticated in any manner, and it rejected the state's argument that the introduction was harmless error.

Relying on its decision in *Harrison*, the supreme court addressed the issue of bloodhound evidence again in *State v. Green*, 210 La. 157, 26 So.2d 487 (1946). In its opinion, the supreme court cited the specific language from *Harrison* set forth above, but without suggesting that any effort had been made by the state to

15

lay a proper foundation for the admissibility of the bloodhound evidence, the supreme court affirmed the defendant's conviction for burglary. In doing so, the supreme court stated the following:

> The judge's per curiam shows that the 'bloodhound' testimony was merely one of the circumstances upon which the verdict was based. He states that the conviction was [based] upon the defendant's confession and other corroborative testimony of which the 'bloodhound' evidence was only one part. The defendant was not denied the privilege of cross-examination or of offering additional testimony that the dog though unregistered, was unreliable or unskilled or that he acted on the [trail] so as to deprive the evidence of incriminating value. We think that the courts of this State have been rightfully cautious in admitting this 'dumb-animal' testimony and that the rule announced in the quotation above is a proper one and that along with the conditions stated in the rule, the defendant should have the fullest opportunity by cross-examination and otherwise to inquire into the breeding and testing of the dog and into the circumstances and details of the hunt and to introduce other relevant testimony tending to destroy the incriminating value of the evidence. *The facts of the case at bar bring it within the rule rather broadly recognized that under certain circumstances, and subject to the defendant's right to cross-examination and to introduce evidence of contradicting facts, testimony as to trailing by bloodhounds may be permitted to go to the jury 'for what it is worth' as 'one of the circumstances' which may tend to connect the defendant with the crime.*

*Id.* at 488-89 (emphasis added).

We find no jurisprudence to suggest that the rule in *Harrison* is no longer applicable to bloodhound evidence. Unfortunately, we also find no jurisprudence that better defines what constitutes a proper foundation for admissibility. While certainly not binding on this court, we do recognize and find instructive a relatively recent decision concerning bloodhound evidence rendered by the Court of Criminal Appeals of Tennessee. *State v. Barger*, 612 S.W.2d 485 (Tenn.Crim.App. 1980). In *Barger*, the defendant was convicted of burglary partially based on bloodhound evidence. Using the scent from a shirt and shoe obtained from the defendant, a bloodhound followed a trail from the burglarized home into the woods behind the home, where several of the stolen items were

16

recovered.  On appeal, the defendant asserted that the bloodhound evidence violated his constitutional right to confront and cross-examine the witness.  He also attacked the reliability of the bloodhound evidence by arguing that the state failed to lay a proper foundation for its admission.

The *Barger* court first noted that the inability to cross-examine the bloodhound was not prejudicial, so long as the handler of the animal was made available for examination as to the dog's qualifications and activities on the day of the tracking.  Further, the *Barger* court listed five criteria that it concluded must be addressed to establish the requisite foundation: 1) the dog must be a purebred and of the type "characterized by acuteness of scent and power of discrimination"; 2) "it must be accustomed and trained to track human scents"; 3) "it must be shown by experience in actual cases to be reliable in tracking"; 4) the dog "must have been placed on the trail at a spot where the suspect was known to have been" or on a track which circumstances indicate he made; and 5) the dog must have been placed on the trail within a period of efficiency, that is, for example, before a rain storm or a lengthy passage of time. *Id.* at 491-92.

In *Barger*, a copy of the bloodhound's registration as a purebred was introduced at trial, and the owner/handler testified that he learned to train a trailing dog from a book; that the dog had successfully tracked humans on three prior occasions; and that the dog had been placed on the trail at the home that was burglarized within a short time after the defendant was taken into custody and before any change in the weather.  The *Barger* court found this to be a proper foundation for the admission of the bloodhound-tracking evidence.  Additionally, the *Barger* court noted that it was error for the trial court not to instruct the jury that the bloodhound evidence was not infallible and should not be given undue

17

weight, but did not consider the error because the defendant failed to make a contemporaneous objection.

In the matter before us, the trial court did instruct the jury that "[t]estimony regarding the use of bloodhounds and their actions is admissible against a person accused of a crime, merely as a circumstance tending to prove his guilt." However, finding the *Barger* decision to be instructive and considering the factors found therein, we find that there is insufficient evidence to establish the qualifications of the bloodhounds used to track the defendant's exit from the Tobacco Warehouse. No evidence of certification was introduced by the state, and, when asked about the bloodhounds' scenting abilities, Officer Gallien testified only that "[t]hey can smell, I don't know how many hundred times better than a human can smell. They're real good with their noses." Interestingly, Officer Gallien also testified that the best time for a bloodhound to trail is when it is raining. He explained that "the rain brings the scent up off the ground." The *Barger* court, on the other hand, noted that the bloodhound needed to be placed on the trail prior to rain because rain weakens the scent beyond the point of reliability. Additionally, although Officer Gallien could relate some examples of successful trailing by the two bloodhounds used in this case, he could not assert any degree of overall tracking reliability because of a complete lack of records.

Finally, the trail tracked by Trusty and Bo raises questions concerning the degree of accuracy that can be given to their actions as neither tracked the exact same trail and both terminated their tracking efforts at different locations. As the court in *Harrison* concluded with the facts before it, in this case there is no means of knowing whether the jury would have convicted the defendant if the evidence had not been introduced and "that the facts sought to be proven by the illegal

18

evidence were material and relevant to the issues, and that the illegal evidence might therefore have had some influence in producing the verdict[.]" *Harrison*, 88 So. at 697. We find that the trial court erred in allowing the bloodhound evidence to be introduced to the jury.

In his fourth assignment of error, the defendant again argues that his right to confront his accusers was violated. In this assignment, he complains that the constitutional violation occurred when the trial court allowed Mr. Wojtkiewicz to testify regarding the results of the DNA analysis and that his trial attorney provided ineffective assistance when he failed to object to the testimony and failed to subpoena the appropriate Crime Lab witness.

This issue arises because the actual Crime Lab employee who performed the DNA analysis was on maternity leave at the time of trial, and Mr. Wojtkiewicz testified concerning the results of that testing based on his review of her notes and the tests and procedures applied in the analysis. At trial, the defendant's counsel did not object to Mr. Wojtkiewicz's testimony, and this failure to object generally constitutes a waiver of this alleged error in a post-conviction proceeding. La.Code Crim.P. art. 841; *State v. Hayes*, 44,219 (La.App. 2 Cir. 7/15/09), 16 So.3d 604, *writ denied*, 09-1897 (La. 6/18/10), 38 So.3d 317; and *State v. Thibodeaux*, 97-1636 (La.App. 3 Cir. 11/18/98), 728 So.2d 416, *writ denied*, 98-3131 (La. 5/7/99), 741 So.2d 27, *cert. denied*, 528 U.S. 936, 120 S.Ct. 341 (1999). However, because the defendant asserts that the evidence was allowed in as a result of his counsel's failure to object, this claim is properly before this court for review. *State v. Johnson*, 95-711 (La.App. 3 Cir. 3/29/96), 664 So.2d 766, *writ denied*, 96-82 (La. 3/29/96), 670 So.2d 1236.

Although Mr. Wojtkiewicz was recognized as an expert in DNA analysis without objection from the defendant,[9] he acknowledged in his testimony that the actual analysis was accomplished by Kelli Raley, another employee of the Crime Lab, who was on maternity leave at the time of trial. Although he did not personally perform the analysis, Mr. Wojtkiewicz was admittedly familiar with the protocols and procedures required of the analysis.[10] In preparation for his testimony, Mr. Wojtkiewicz reviewed Ms. Raley's notes and stated that he was satisfied with the tests conducted, the procedures applied to those tests, and the accuracy of the results.

In support of his argument, the defendant directs us to two United States Supreme Court cases, *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004), and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527 (2009). In *Melendez-Diaz*, the defendant was charged with distributing cocaine and with trafficking cocaine in an amount between fourteen and twenty-eight grams. At trial, the prosecution placed into evidence the bags seized and three documents containing the results of the forensic analysis performed on the seized substances. These written certificates reported the weight of the seized bags and stated that the substance found in the bags had been examined and was determined to be cocaine. The three certificates contained the notarized signatures of the individuals from the Massachusetts laboratory performing the analysis as required under Massachusetts law.

The defendant objected to the admission of the certificates, asserting that the Supreme Court's decision in *Crawford*, 541 U.S. 36, required the analysts to testify

---

[9] Mr. Wojtkiewicz had testified in Louisiana courts approximately thirty times relative to DNA analysis.

[10] In fact, Mr. Wojtkiewicz had developed some of the protocols and procedures himself.

in person. The trial court overruled the objection and admitted the certificates pursuant to state law as "'prima facie evidence of the composition, quality, and the net weight of the narcotic . . . analyzed.'" *Melendez-Diaz*, 557 U.S. at 2531 (quoting Mass. Gen. Laws, ch. 111, § 13 (West 2006)). In reversing the conviction, the Supreme Court discussed the application of its decision in *Crawford*, as well as other decisions, and stated in pertinent part:

> The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford*, after reviewing the Clause's historical underpinnings, we held that it guarantees a defendant's right to confront those "who bear 'testimony'" against him. 541 U.S. [36,] 51, 124 S.Ct. 1354. A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. *Id.* at 54, 124 S.Ct. 1354.

> Our opinion described the class of testimonial statements covered by the Confrontation Clause as follows:

>> "Various formulations of this core class of testimonial statements exist: *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.*, at 51-52, 124 S.Ct. 1354 (internal quotation marks and citations omitted)."

> There is little doubt that the documents at issue in this case fall within the "core class of testimonial statements" thus described. Our description of that category mentions affidavits twice. See also *White v. Illinois*, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (THOMAS, J., concurring in part and concurring in judgment) ("[T]he Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such

21

as affidavits, depositions, prior testimony, or confessions"). The documents at issue here, while denominated by Massachusetts law "certificates," are quite plainly affidavits: "declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths." Black's Law Dictionary 62 (8th ed.2004). They are incontrovertibly a " 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Crawford, supra*, at 51, 124 S.Ct. 1354 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). The fact in question is that the substance found in the possession of Melendez-Diaz and his codefendants was, as the prosecution claimed, cocaine-the precise testimony the analysts would be expected to provide if called at trial. The "certificates" are functionally identical to live, in-court testimony, doing "precisely what a witness does on direct examination." *Davis v. Washington*, 547 U.S. 813, 830, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (emphasis deleted).

Here, moreover, not only were the affidavits " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' " *Crawford, supra,* at 52, 124 S.Ct. 1354, but under Massachusetts law the *sole purpose* of the affidavits was to provide "prima facie evidence of the composition, quality, and the net weight" of the analyzed substance, Mass. Gen. Laws, ch. 111, § 13. We can safely assume that the analysts were aware of the affidavits' evidentiary purpose, since that purpose—as stated in the relevant state-law provision—was reprinted on the affidavits themselves. See App. to Pet. for Cert. 25a, 27a, 29a.

In short, under our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were "witnesses" for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to " 'be confronted with' " the analysts at trial. *Crawford, supr*a, at 54, 124 S.Ct. 1354.

. . . .

Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. See Fed. Rule Evid. 803(6). But that is not the case if the regularly conducted business activity is the production of evidence for use at trial. Our decision in *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), made that distinction clear. There we held that an accident report provided by an employee of a railroad company did not qualify as a business record because, although kept in the regular course of the railroad's operations, it was "calculated for use essentially in the court, not in the business." *Id.*, at 114, 63 S.Ct. 477. The analysts' certificates—like police reports generated by law

enforcement officials—do not qualify as business or public records for precisely the same reason. See Rule 803(8) (defining public records as "excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel").

. . . .

Respondent asserts that we should find no Confrontation Clause violation in this case because petitioner had the ability to subpoena the analysts. But that power—whether pursuant to state law or the Compulsory Process Clause—is no substitute for the right of confrontation. Unlike the Confrontation Clause, those provisions are of no use to the defendant when the witness is unavailable or simply refuses to appear. See, *e.g.*, *Davis*, 547 U.S., at 820, 126 S.Ct. 2266 ("[The witness] was subpoenaed, but she did not appear at . . . trial). Converting the prosecution's duty under the Confrontation Clause into the defendant's privilege under state law or the Compulsory Process Clause shifts the consequences of adverse-witness no-shows from the State to the accused. More fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court. Its value to the defendant is not replaced by a system in which the prosecution presents its evidence via *ex parte* affidavits and waits for the defendant to subpoena the affiants if he chooses.

. . . .

First, the dissent believes that those state statutes "requiring the defendant to give early notice of his intent to confront the analyst," are "burden-shifting statutes [that] may be invalidated by the Court's reasoning." *Post*, at 2554, 2557 - 2558. That is not so. In their simplest form, notice-and-demand statutes require the prosecution to provide notice to the defendant of its intent to use an analyst's report as evidence at trial, after which the defendant is given a period of time in which he may object to the admission of the evidence absent the analyst's appearance live at trial. See, *e.g.*, Ga.Code Ann.§ 35-3-154.1 (2006); 4 (Vernon 2005); Ohio Rev.Code Ann. § 2925.51(C) (West 2006). Contrary to the dissent's perception, these statutes shift no burden whatever. The defendant *always* has the burden of raising his Confrontation Clause objection; notice-and-demand statutes simply govern the *time* within which he must do so. States are free to adopt procedural rules governing objections. Today's decision will not disrupt criminal prosecutions in the many large States whose practice is already in accord with the Confrontation Clause. . . .

. . . .

This case involves little more than the application of our holding in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. The Sixth Amendment does not permit the prosecution

23

to prove its case via *ex parte* out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error. We therefore reverse the judgment of the Appeals Court of Massachusetts and remand the case for further proceedings not inconsistent with this opinion.

*Id.* at 2531-42 (alteration in original) (footnotes omitted) (citations omitted).

The Louisiana Supreme Court has not addressed this issue in light of *Melendez-Diaz*, although *Melendez-Diaz* was addressed in *State v. Davidson*, 44,916 (La.App. 2 Cir. 2/10/10), 32 So.3d 290, *writ denied*, 10-579 (La. 10/1/10), 45 So.3d 1096. In *Davidson*, the defendant appealed his conviction of possession of cocaine asserting that the laboratory report containing the results and weight of the cocaine should not have been admitted into evidence. The second circuit concluded that the report was clearly testimonial as explained in *Melendez-Diaz*, but that "[a]ssuming, *arguendo*, that the report in this case violated the Sixth Amendment, it would still be subject to a harmless error analysis." *Id.* at 297. Without addressing the Sixth-Amendment issue, the second circuit concluded that any error in allowing its introduction was harmless based on the fact that one of the defendant's witness had testified that the substance was cocaine and because one of the investigating officers had field-tested the substance and determined that it was cocaine.

In *Larkin v. Yates*, No. CV 09-2034-DSF (CT), 2009 WL 2049991 (C.D. Cal. July 9, 2009), *aff'd*, 417 Fed.App'x. 708 (9th Cir. 2011), *cert. denied*, __U.S. __, 132 S.Ct. 186 (2011), an expert witness testified concerning the results of a DNA analysis performed in a laboratory where she was a supervisor. In her testimony, the expert asserted that she had independently reviewed the relevant data and had reached an independent interpretation of that data. The district court concluded that such testimony "is not akin to the affidavit-like certificates of

analysis in *Melendez-Diaz*." *Id.* at 1. The district court further noted that "[w]hereas the certificates of analysis in *Melendez-Diaz* were 'functionally identical to live, in court testimony,' the test results here, at best, served as a partial basis for the opinion of a testifying expert." *Id.*

We find no error in the trial court's ruling allowing Mr. Wojtkiewicz to testify concerning his interpretation of Ms. Railey's analysis. Therefore, we find no merit in the defendant's argument that his trial counsel was ineffective in failing to object to Mr. Wojtkiewicz's testimony.[11]

However, when considering the record before us, we find that when we view the evidence in a light most favorable to the state, no reasonable trier of fact could have found that the state proved beyond a reasonable doubt that the defendant committed the armed robbery of April 23, 2005, either as the individual who directly committed the armed robbery or as a principal in the robbery. *Leger*, 936 So.2d 108. No witnesses were able to identify the defendant as the individual who committed the actual robbery, and the only two who came in direct contact with the actual perpetrator of the offense, when confronted with a lineup containing the defendant's photograph, picked other men. While the inconsistent statements related by the investigating officers could be considered indicative of a guilty mind, as suggested in *Wiley*, 880 So.2d 854, standing alone, they are not sufficient to carry the state's burden. Additionally, the state placed much emphasis on the tracking results of the bloodhounds using the defendant's sock as the scent; however, that finding, even if admissible, is inconsistent with the fact that the defendant's DNA was not present on the weapon found in his brother's possession.

---

[11] Because the issue was not raised on appeal, we make no finding concerning whether the state carried its burden in establishing that Ms. Raley was unavailable to testify at trial by the general comment that she was on "maternity leave," without establishing the specific status of that leave at the time of trial.

Moreover, although the defendant was a major contributor to the DNA found on the stocking-material recovered from the Lincoln, absent any other evidence connecting him to the offense, the presence of that DNA could be explained by the simple act of the defendant picking up the stocking-material on an occasion when he was in the vehicle. The record establishes that the brothers lived together and, as brothers, their clothes could have been shared, thereby causing their individual DNA to be found on items used by the other. Based on the record before us, we cannot conclude that the state excluded every reasonable hypothesis that the defendant was not the individual who committed the armed robbery or drove the Lincoln from the scene of the robbery.

Having reached the conclusion that there is merit in the defendant's assignment of error addressing the sufficiency of the evidence, we need not consider the remaining assignments of error.

## DISPOSITION

For the foregoing reasons, we vacate the conviction and sentence of the defendant and enter a verdict of not guilty.

**REVERSED AND RENDERED.**