PER CURIAM.
We granted the state’s application to consider the Third Circuit’s decision reversing defendant’s conviction and sentence for armed robbery in violation of La.R.S. 14:64. State v. Oliphant, 13-473 (La.App. 3 Cir. 11/20/13), 127 So.3d 91 (unpub’d). For the reasons that follow, the court of appeal’s decision is reversed in part and affirmed in part. The case is remanded to the district court for further proceedings.
On appeal, the Third Circuit first addressed defendant’s claim that there was insufficient evidence to support his conviction. Testimony at trial gave the following account of circumstances leading to defendant’s arrest and prosecution. On April 23, 2005, around 2:00 p.m., a man armed with a pistol entered the Tobacco Warehouse in Natchitoches and took approximately $700 from the cashier at gunpoint. A store employee, Jared Bennett, described the perpetrator as a black man, wearing black pants and a dark hooded sweatshirt with the hood pulled over his head and a piece of cloth over his face. Another employee, Julie Beard, described *1257 the man as a black male in his early twenties with brown eyes, short hair, wearing a hooded sweatshirt with “some pantyhose thing” over his face.
Immediately following the robbery, Riley Stanfield, who lived on the street behind the convenience store, observed a man dressed in a dark hooded sweatshirt run through his yard, jump over the fence, and climb into the passenger side of a white Lincoln. He testified that the car was approximately 150 to 200 yards away and he could see another black male in the driver’s seat. Stanfield could not provide a description of either man; however, he did note that the molding below the car door was missing.
At approximately 4:00 p.m., Natchitoch-es Police Officer Joel Mitchell observed a white Lincoln Town Car run a stop sign. Mitchell, who was aware of the description of the vehicle associated with the robbery, attempted to initiate a traffic stop. The driver initially made an attempt to escape, but ultimately stopped the car. The car was missing the molding below the door and was being driven by Nicholas Oli-phant, defendant’s brother. Oliphant admitted that he had a gun in the car and Mitchell recovered the .22 caliber revolver.
Officer Damien Spillman interrogated Oliphant at the police station. According to Spillman, Oliphant stated that he had been home all day and that defendant could verify that fact. Spillman then went to defendant’s house where defendant agreed to go to the police station. Defendant initially told Spillman that had worked the night shift and then slept most of the day. However, he later changed his story and stated that he was out late the night before, got up around 10:30 a.m. and went to a friend’s house to cut hair. He remained there, except for a brief trip to retrieve a set of clippers, until he learned that his brother had been arrested.
Detective Jeff Franks testified that he observed Spillman’s interrogation of Nicholas Oliphant. He testified that Oliphant stated he and defendant went to buy cigarettes for their mother on the morning of the robbery from Wardworths Grocery Store in Natchitoches. Franks later asked defendant about the trip. Defendant acknowledged the trip; however, he stated he and Oliphant went to McFarland Convenience Store. On cross-examination, Franks acknowledged that in his written statement he indicated the brothers stated the trip took place the night before the robbery.
While interrogating defendant, Spillman called for a set of tracking dogs to assist in the investigation. He asked for one of defendant’s socks and defendant complied with the request. Spillman took the sock to the Tobacco Warehouse where he met Officer Roy Gallien, one of the dog handlers. Gallien testified that there are six tracking dogs on the team, including the two used in this case, Bo and Trusty. The dogs are not certified in any way and all of their experience comes from work at the Natchitoches Parish Detention Center. Gallien testified that the trustees at the detention center were responsible for training the dogs; however, he did not explain if the trustees had any training or expertise. He further acknowledged that there were no records concerning the dogs’ use.
Gallien testified that he let the two dogs sniff the sock Officer Spillman obtained from defendant at approximately 7:15 p.m. on the day of the robbery. The dogs then began to track from the store. The dogs, working separately, tracked similar routes to the route described by Riley Stanfield.
Defendant was thereafter arrested for the armed robbery. A search of the car driven by Nicholas Oliphant uncovered two
*1258 items made of stocking-type material in addition to the .22 caliber revolver. A search of defendant’s home did not result in the seizure of any evidence. Witnesses Stanfield, Bennett, and Beard were all shown photographic lineups that included pictures of defendant and his brother. The pictures were twice the size of the other photos. Even then, none of the witnesses identified defendant or his brother from the lineup. Bennett and Beard chose someone other than defendant and Stanfield did not identify anyone.
Bennett and Beard testified that the gun found in the car driven by defendant’s brother was similar to the one used in the robbery; however, they could not positively identify it because the gun used by the perpetrator was concealed in his sleeve. Bennett also acknowledged that he previously told Officer Spillman that the seized gun was not the one used in the robbery.
Pat Wojtkiewicz from the North Louisiana Crime Lab testified that he conducted DNA analysis on the pistol and the stocking material found in Oliphant’s car. DNA found on the grip and hammer of the gun was a mixture of at least two individuals and defendant’s brother could not be excluded as one of the donors. DNA on the stocking material was also a mixture of at least two individuals and neither defendant nor his brother could be excluded as donors.
On the basis of this testimony, the court of appeal found that there was insufficient evidence to support the conviction. It first noted that no witnesses were able to identify defendant from a photographic lineup and the two Tobacco Warehouse employees chose suspects other than defendant. It acknowledged that the brothers’ inconsistent statements and the bloodhound evidence, even assuming the latter was properly admitted, suggested guilt; however, it emphasized that this evidence was inconsistent with the fact that defendant’s DNA was not found on the gun allegedly used in the robbery. Finally, it noted that while defendant’s DNA was found on a stocking in his brother’s car, the DNA transfer likely occurred because the two brothers lived together. Thus, it concluded that the state failed to exclude every reasonable hypothesis of innocence. Oliphant, 13-473 at 15, 127 So.3d 91.
The court also found that the district court erred by admitting evidence that the bloodhounds tracked defendant’s scent from the scene of the crime. Relying on jurisprudence from this Court as well as other jurisdictions, the court found that the state failed to present sufficient evidence to establish the qualifications of the bloodhounds. Specifically, it noted that the dogs were not certified in any capacity and their reliability could not be confirmed because no records were kept. Oliphant, 13-473 at 10, 127 So.3d 91.
We disagree with the court’s conclusion as to sufficiency. In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984). Additionally, when circumstantial evidence forms the basis of the conviction, the evidence, “assuming every fact to be proved that the evidence tends to prove ... must exclude every reasonable hypothesis of innocence.” R.S. 15:438; see State v. Jacobs, 504 So.2d 817, 820 (La.1987) (all direct and circumstantial evidence must meet the Jackson test); State v. Porretto, 468 So.2d 1142, 1146 (La.1985) (R.S. 15:438 serves as an evidentiary guide for the jury *1259 when considering circumstantial evidence). Finally, review under Jackson’s due process standard encompasses all of the evidence, inadmissible as well as admissible, introduced at trial. State v. Hearold, 603 So.2d 781, 734 (La.1992) (“[W]hen the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial.”).
To support the instant conviction the state relied on inconsistent and conflicting statements from defendant and his brother concerning their whereabouts on the day of the robbery, DNA analysis on a stocking found in the Lincoln that concluded defendant could not be excluded as the donor, and evidence that two bloodhounds trailed defendant’s scent from the convenience store to the area where the perpetrator got into the car.
Generally speaking, inconsistent or conflicting statements can be considered indicative of a guilty mind. Captville, 448 So.2d at 680, n. 4 (“ ‘Lying’ has been recognized as indicative of an awareness of wrongdoing.”) (citing State v. Rault, 445 So.2d 1203, 1213 (La.1984) (“The jury could have reasonably concluded that Rault concocted this version of the crime to hide his own guilt.”)). Thus, it was reasonable for the jury to consider defendant’s conflicting accounts of his whereabouts and activities around the time of the robbery as evidence pointing to his guilt.
Moreover, evidence that two bloodhounds, after smelling defendant’s sock, tracked his scent from the convenience store to the location where the perpetrator got into the getaway car also points to his guilt. The dogs, working separately, tracked similar paths from the store, and ended their searches in similar locations.
As to the DNA evidence, analysis showed that DNA found on a stocking found in the car of defendant’s brother came from at least two people and defendant could not be excluded as one of the donors. Both witnesses from the store stated that the perpetrator was wearing something over his face. One of the witnesses, Julie Beard, described the covering as “some pantyhose thing.”
The totality of the evidence is sufficient to support the conviction. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the “fact finder’s discretion ... only to the extent necessary to guarantee the fundamental due process of law.” State v. Mussall, 523 So.2d 1305, 1310 (La.1988). Clearly, the jury in the instant case accepted the testimony of Officer Gallien concerning the bloodhound tracking and believed that the dogs accurately tracked defendant’s scent from the scene of the crime to the area where the perpetrator got into the getaway car. This evidence taken in conjunction with the facts that defendant’s brother was found driving a car similar to the getaway vehicle, a stocking and .22 caliber revolver similar to the ones used during the robbery were found in the car, defendant could not be excluded as a donor of DNA found on that stocking, and defendant and his brother presented inconsistent and conflicting accounts of their whereabouts at the time of the robbery, allowed the jury to rationally conclude that defendant was guilty of the robbery despite the fact that none of the witnesses could identify him as the perpetrator.
We affirm, however, the Third Circuit’s finding that the district court erred *1260 by admitting the bloodhound evidence at trial. There is little jurisprudence, in Louisiana concerning the admissibility of bloodhound tracking evidence. This Court had found that the evidence may be admissible if the state lays a foundation including “some proof of the reliability of the dogs, their acuteness of scent and power or sense of discrimination, and, in that respect, their reputation for trailing criminals, their pedigree, training, etc.” State v. Green, 210 La. 157, 26 So.2d 487, 488 (1946) (quoting State v. Harrison, 149 La. 83, 88 So. 696, 697 (1921)). However, the Court noted that even if the state lays the proper foundation the evidence should only “go to the jury ‘for what it is worth’ as ‘one of the circumstances’ which may tend to connect the defendant with the crime.” Id., 26 So.2d at 489.
In the present case, the state failed to lay the proper foundation for admission. First, the state concedes the dogs used in the instant case are not pure breed bloodhounds. Officer Gallien testified that be believed their mother was a dog living at Angola and that dog mated with dogs living at other correctional institutions around the state. The state did not introduce any documentation concerning the dogs’ lineage. Moreover, the state presented little information concerning the training of the dogs. Gallien testified the dogs are not certified in any capacity, “but they are very good in my book.” He explained that trustees at the detention center train the dogs and that the dogs “are real good with their noses.” As to their history of reliability, Gallien stated that one of the dogs recently located a missing person who had fallen off a dock and drowned. He further stated the dogs have “been used a good bit” to find people in the area. On cross-examination, Gallien admitted that he could not remember which dogs were used for different missions; therefore, he could not be more specific about the experience of the dogs used in the instant case. He further admitted that there are no records as to the dogs’ experience or rate of success. Accordingly, Gallien’s anecdotal evidence of the dogs’ experience cannot be verified. It is undisputed that the dogs began their search where the perpetrator was known to have been; however, they began their search five-and-one-half hours after the robbery, thus, giving any scent time to dissipate. Given the complete lack of verifiable information relating the dogs training, experience, or abilities, the court erred by admitting the evidence.[1]
When evidence is improperly admitted it is subject to harmless-error analysis. State v. Johnson, 94-1379, pp. 17-18 (La.11/27/95), 664 So.2d 94, 102 (errors leading to improper admission of evidence subject to harmless-error analysis; error harmless if verdict “surely unattributable” to error) (quoting Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. *1261 2078, 2081, 124 L.Ed.2d 182 (1993)). Here, as the court of appeal determined, the error was not harmless. The bloodhound evidence introduced by the state was the only evidence that directly connected defendant to the scene. None of the witnesses identified him as the perpetrator, he was not found in the car resembling the getaway vehicle, and no evidence connecting him to the crime was found in his home. Without the bloodhound evidence, the state had only DNA analysis stating that defendant could not be excluded as a donor of DNA found on a stocking in his brother’s car that resembled the stocking worn by the perpetrator in addition to the conflicting statements given by the brothers. Thus, it cannot be said that the verdict in this case was “surely unattributable” to the bloodhound evidence.
As opposed to a finding of insufficient evidence which may provide grounds for an acquittal or entry of a verdict on a lesser and included offense, the remedy for trial error is retrial of the case. Hearold, 603 So.2d at 734 (“If the reviewing court determines there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused must receive a new trial, but is not entitled to an acquittal even though the admissible evidence, considered alone, was insufficient.”) (citing Lockhart v. Nelson, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988)). Accordingly, the Third Circuit’s ruling as to sufficiency is reversed and its ruling as to the admission of the bloodhound evidence is affirmed. This ease is remanded to the district court for further proceedings consistent with the view express herein.
DECISION OF COURT OF APPEAL REVERSED IN PART, AFFIRMED IN PART; CASE REMANDED.

. Compare, for example, the evidence presented in Florida v. Harris, - U.S. -, 133 S.Ct. 1050, 1058, 185 L.Ed.2d 61 (2013), supporting the reliability of a drug detection dog providing the sniff that the Supreme Court found “up to snuff” in establishing probable cause for a search:
The State showed that two years before alerting to Harris’s truck, Aldo [the dog] had successfully completed a 120-hour program in narcotics detection, and separately obtained a certification from an independent company. And although the certification expired after a year, the Sheriff’s Office required continuing training for Aldo and [K-9 officer] Wheetley. The two satisfied the requirements of another, 40-hour training program one year prior to the search at issue. And Wheetley worked with Aldo for four hours each week on exercises designed to keep their skills sharp. Wheedey testified, and written records confirmed, that in those settings Aldo always performed at the highest level.