# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 25-758

STATE OF LOUISIANA

VERSUS

CODY SALVADOR GUCCIONE

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR179418
HONORABLE MICHELE S. BILLEAUD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

WILBUR L. STILES
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Jonathan W. Perry, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.

AFFIRMED, WITH INSTRUCTIONS.

**Donald D. Landry**
**District Attorney**
**Indira Lex**
**Assistant District Attorney**
**15th Judicial District**
**Parish of Lafayette**
**800 S. Buchanan St., 6th Floor**
**Lafayette, LA 70501**
**(337) 232-5170**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**Douglas Daniel Brown**
**The Douglas Brown Law Firm, LLC**
**P.O. Box 2826**
**725 Westin Oaks Drive**
**Hammond, LA 70404**
**(985) 310-6900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Cody Salvador Guccione**

**STILES, Judge.**

Defendant, Cody Salvador Guccione, was found guilty by a unanimous jury of second degree murder, in violation of La.R.S. 14:30.1. Defendant has appealed. For the following reasons, we affirm Defendant's conviction and sentence.

**FACTS AND PROCEDURAL HISTORY**

Defendant was admittedly addicted to drugs, and the victim, Leo Jack, was his drug dealer. On February 3, 2021, Defendant entered the victim's apartment in Lafayette and killed him with a knife.

At trial Defendant testified that he became addicted to heroin when he was twenty-one years old. He originally met the victim through another drug dealer known as "Pup." When Pup was arrested and jailed, the victim became Defendant's main dealer. According to Defendant, the victim was known to have "mood swings." In text exchanges between Defendant and his girlfriend, Emily Warren, they referred to the victim as "bipolar."

The victim's older brother, Lysanders "Trent" Jack, testified that on February 4, 2021, he was at work when he received an Instagram message from an acquaintance, expressing concern about the victim because he was not answering his door. Jack contacted his other siblings, then headed to the victim's apartment. When he arrived, another brother and a cousin were there knocking on the door. Jack realized that the Ring camera was missing and became suspicious that something wasn't right. The cousin was able to open the victim's living room window. The brothers entered through it and unlocked the front door. Jack testified that things seemed off in the apartment. He noticed a stain on the floor and blood on the wall. Jack walked back outside and his brother went into the victim's bedroom where he

discovered the victim's dead body in a closet. Jack noted that the victim had owned a gun in the past but that it had been stolen.

Sergeant Matt Benoit of the Lafayette Police Department was dispatched to the scene. He testified that when he arrived, he spoke with one of the Jack brothers who told him that the victim was dead inside the apartment. Sergeant Benoit and a detective with the police department conducted a safety sweep of the apartment, during which they saw a large amount of blood on the floor, in the hallway, and in the bedroom. They observed the victim's body in the bedroom closet. The victim's clothes were bloody, and his throat had been cut.

The victim's upstairs neighbor, Zachary Hill, testified that on February 3, 2021, he heard what sounded like a fight in the victim's apartment directly beneath him. He recorded audio of the altercation on his cell phone while holding it close to his floor. Hill did not think of notifying the police at the time but told the police of the incident when he saw them at the scene the next day. After giving a statement to the police, he gave them a copy of his cell phone video.

Detective Devin Touchet of the Lafayette Police Department testified that on February 4, 2021, he was dispatched to the crime scene where he canvassed the apartment complex looking for any witnesses. He spoke with Hill, the upstairs neighbor, and viewed the video Hill had taken. Detective Touchet noted that the timestamp on the recording of the altercation indicated that it occurred at 5:49 p.m. on February 3, 2021. Through interviews with the victim's family, investigators realized that the victim had a Ring security camera which was missing. A search warrant was obtained for the video footage contained on the Ring camera company's "cloud" and the footage was sent to the police department.

The Ring camera footage obtained by the police department consists of multiple clips, many of which were not pertinent to this case. However, some of the clips depicted a white male being allowed into the victim's apartment at 5:49 p.m. on the day of the incident. The audio recorded a scream or yell shortly after the subject's entry. Another clip showed the same subject leaving at 6:03 p.m. with a trash can. Further investigation identified the white male subject as Defendant Cody Guccione. There was also video footage showing the Ring camera being removed at 7:59 p.m. by Defendant.

Detective Andrea Lavergne, who worked with the Lafayette Police Department as a crime scene detective, testified that she took photographs of the crime scene which were introduced into evidence. She noted that there was blood in several areas of the victim's apartment, as well as bloody shoe impressions. Detective Lavergne also noted a mop in the victim's bedroom that was saturated in blood. She further observed lacerations on the victim's body.

Forensic pathologist Dr. Christopher Tape conducted the autopsy of the victim. He testified that the victim's body had multiple wounds from a sharp weapon. The attack damaged the victim's jugular vein and subclavian artery, causing him to die of blood loss. Additionally, cuts to the victim's throat caused him to breath in blood, described by Dr. Tape as "drowning from the inside by blood and your lung is being clogged by the outside." Dr. Tape observed that the victim had defensive wounds on his hands. He further noted that the victim had a high level of fentanyl in his system at the time of his death.

Emily Warren, Defendant's girlfriend at the time of the incident, also testified at trial. In 2021, the victim was her drug dealer. Warren testified regarding text conversations she had with Defendant February 3, 2021, in which they discussed

3

how to get money for drugs. Their texts included a scheme to delay payment to the victim as Defendant was short of the amount he needed to buy drugs. In a later text conversation, Defendant mentioned the possibility of stealing cash from the victim. Later that night, Defendant came home with a small amount of drugs, slept on the couch, and left again early the next morning. On February 4, 2021, Warren received a text from a friend informing her that the victim had been stabbed to death. Warren testified that when she told Defendant about the victim's death, Defendant behaved as though he was shocked by the news.

When questioned about her relationship with the victim, Warren testified that he could be moody and sometimes cursed out customers who owed him money, but that she was never scared of him. She noted that the victim sometimes helped his customers by doing things such as giving them food. According to Warren, neither the Defendant nor the victim were violent. However, she acknowledged that Defendant once pushed her against the wall during an argument.

After getting the news about the victim, Warren went to work and she thought Defendant went fishing. Later, Defendant texted her from an unfamiliar number and said he was lost in the woods and trying to find his way back to his car. Warren was contacted by police the night of February 4, 2021, because they were looking for Defendant. She went to the police station where she was shown pictures of a suspect whom she identified as Defendant. While at the police station, Warren called Defendant to let him know the police wanted to talk to him. He denied any involvement in the homicide but claimed to be afraid because he was on probation.

Walter Alexander, an old friend of the victim's, testified that when the victim's family realized they could not contact the victim, Alexander went to the victim's apartment. Alexander testified that in daily life, the victim had a habit of

4

letting someone into his apartment and then turning his back on whoever he let in. Alexander thought this was a dangerous habit. He did, however, note that the victim did not let strangers into his apartment, kept his door locked, and a had a "door stopper" that helped hold it closed. Alexander also noted that the victim was addicted to heroin and fentanyl and that those drugs would make the victim slow and sleepy. Alexander identified Defendant in a clip taken from the Ring camera of Defendant arriving at the victim's apartment.

Detective James Gayle of the Lafayette Police Department was the lead detective assigned to this case. He testified that the investigators were able to identify Defendant from a screen shot retrieved from footage recorded by the victim's Ring camera. Detectives also viewed security footage from the apartment complex's security cameras, some of which depicted Defendant walking in the area with a neck gaiter pulled up over his face. Specifically, security footage from the parking lot of the victim's apartment complex showed Defendant in the area at about 5:48 p.m. on February 3, 2021. This matched up with the Ring camera video that recorded Defendant entering the victim's apartment and the subsequent scream or yell. Detective Gayle further testified that when police apprehended Defendant several days later at a local motel, he had a number of superficial cuts, scratches, and small wounds. On cross-examination, Detective Gayle acknowledged that he could not state whether Defendant took drugs or cash from the apartment, although Defendant did take a trash can, some clothing, and the Ring camera.

During Defendant's case-in-chief, defense counsel adduced the testimony of Shelby Burch, a long-time friend of the victim. She went to the victim's apartment after hearing that the victim was dead. Subsequently, she gave a statement to the police, stating that the victim had been "spooked" and did not want to sleep in his

apartment alone. She also stated that the victim owned a gun. During cross-examination, Burch noted that the victim was careful about who he let into his apartment, but that once he did so, he tended to immediately turn his back. She also said that the victim was not a violent or confrontational person.

Defense counsel then questioned Dr. Jimmie Valentine, an expert in forensic toxicology and medical pharmacology. Dr. Valentine testified that the victim had low levels of diazepam and THC in his blood at the time of his death. However, the level of fentanyl in his blood was high, potentially lethal. Dr. Valentine did acknowledge that some users of fentanyl can develop a tolerance for higher levels of the drug. Dr. Valentine also explained that lower, therapeutic levels of fentanyl can make a user drowsy, but that users who have developed higher levels of tolerance and take higher doses of fentanyl may hallucinate or become aggressive.

On cross-examination, Dr. Valentine acknowledged that there were very few studies regarding fentanyl's relation to aggressive behavior in humans, and that those that do exist "are not very good." The main studies on fentanyl-based aggression used rats, mice, and zebra fish. Dr. Valentine admitted that he had never personally encountered an aggressive person on fentanyl. On re-direct examination, Dr. Valentine reiterated that high doses of fentanyl can cause hallucinations.

Defendant testified in his own defense at trial. He acknowledged being a heroin addict and that the victim was his main dealer. Defendant claimed that the victim had mood swings, sometimes becoming aggressive, and that in the days shortly before the incident, the victim was paranoid. Defendant admitted using heroin and fentanyl intravenously, as well as using crack cocaine. According to Defendant, although he and Warren sometimes owed money to the victim, it was never a problem. He also stated that the victim regularly carried a gun.

6

Defendant acknowledged that on the date of the incident, February 3, 2021, he was at the victim's apartment multiple times to buy drugs. He returned to the victim's apartment around 5:00 p.m. but testified that the victim was paranoid and told Defendant to come back in thirty minutes and to park across the street. According to Defendant, the victim had his handgun, a Glock, on a nightstand near his bed. Defendant admitted that when he returned to the apartment at 5:48 p.m., his neck gaiter was pulled up over his face but explained that it was because he did not want to be recognized by anyone, such as members of his drug-recovery group, as he crossed the street to the victim's apartment. He also claimed to have been affected by the victim's paranoia and thought it was possible that the area was being watched.

Once Defendant reached the victim's apartment, the victim let him in, then turned to head to the bedroom. Defendant testified that the victim was carrying his rod-shaped door stopper when he suddenly turned around and threw the door stopper at Defendant, then rushed Defendant and pinned him to a wall. According to Defendant, the victim threatened to kill him. Defendant drew a knife from his belt, dropped it, then regained control of it. The two men struggled for the knife as the victim continued to make threats against Defendant. Defendant stated that at some point there was enough space between the two of them which allowed him to bring the knife downward into the victim's neck. The victim started bleeding from the mouth, but the struggle continued. Defendant testified that he started feeling very tired and that he was worried about the victim's gun.

According to Defendant, the two men separated and the victim began moving across his bed toward the gun on the nightstand. Afraid of what would happen if the victim reached his gun, Defendant testified that he put his left hand on the back of the victim's head and the knife on his neck and cut his throat. When nothing

happened, Defendant cut the victim's throat again. The victim then rolled over from the bed onto the floor. For a second, the two of them looked at one another, then the victim died.

Defendant moved the victim's body into the closet and made a brief attempt to clean up the scene with a mop. However, he soon realized there was too much blood to clean up. Defendant found a hoodie and shoes in the apartment to replace his bloody clothes and shoes. He then threw his bloody clothes into a trash can. Defendant grabbed the gun, put it in his waistband, and left with the trash can. He later returned to the apartment and took the Ring camera.

A Lafayette Parish grand jury indicted Defendant on March 24, 2021, for the second degree murder of Leo Jack. On February 11, 2025, the parties selected a trial jury, which unanimously found Defendant guilty as charged on February 14, 2025. On February 21, 2025, defense counsel filed a Motion of Post-Verdict Judgment of Acquittal or, In the Alternative, For a New Trial, or, If Denied, For a Responsive Verdict of Manslaughter. The trial court heard arguments from the State and the defense on March 11, 2025, after which it denied the motion. The delay for sentencing was expressly waived under La.Code Crim.P. art. 873. The trial court then sentenced Defendant to life imprisonment without the benefit of probation, parole, or suspension of sentence.

Defendant now seeks review of his conviction and sentence, assigning the following errors:

I.    The trial court erred in denying the defendant's motion for mistrial when the state elicited testimony that the defendant maintained his silence post-arrest and used the silence to impeach the defendant's self-defense claim in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

II.     The evidence was insufficient to support a conviction for second-degree murder where the state failed to prove beyond a reasonable doubt that the defendant did not act in self-defense.

III.    The trial court erred in denying the motion to modify the verdict to manslaughter where the evidence established by a preponderance that the killing occurred in sudden passion or heat of blood immediately caused by provocation.

IV.    The trial court erred by failing to properly instruct the jury on the burden of proof for mitigating factors, requiring the defendant to prove mitigation beyond a reasonable doubt rather than by a preponderance of the evidence.

V.     The sentence of life imprisonment without benefit of parole, probation, or suspension of sentence is constitutionally excessive under the circumstances of this case.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent. However, we note that the Uniform Sentencing Commitment Order (USCO) requires correction.

The sentencing transcript reflects that Defendant was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence. The USCO does not include the length of Defendant's sentence nor does it state that the sentence is to be served without the benefit of parole, probation, or suspension of sentence. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Although the sentencing minutes are correct in this case, this court also orders correction of the commitment order when it conflicts with the transcript. *See State v. Barker*, 24-379 (La.App. 3 Cir. 2/5/25), 407 So.3d 776, *writ denied*, 25-257 (La. 4/23/25), 406 So.3d 1179.

9

Thus, we order the correction of the USCO to include the length of Defendant's sentence as well as the denial of parole, probation, or suspension of sentence.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Defendant argues that the evidence was insufficient to support his second degree murder conviction, specifically, that the State failed to prove that he did not act in self-defense. Such an assignment must be addressed first, as a finding that the evidence was insufficient would necessitate an acquittal. *State v. Hearold*, 603 So.2d 731 (La.1992) (citing *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970 (1981)).

The general test for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Self-defense claims fall under the aegis of La.R.S. 14:20(A), which explains, in pertinent part, "[a] homicide is justifiable: (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from

that danger." When a defendant asserts justifiable homicide, "[t]he State has the affirmative burden of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense." *State v. Levine*, 24-493, p. 17 (La.App. 3 Cir. 3/19/25), 408 So.3d 1108, 1121.

On appeal, Defendant presents the same scenario that he did at trial, i.e., that he had to use lethal force to defend himself against the aggressive victim, who was found to have high levels of fentanyl in his blood stream. Defendant refers to Dr. Valentine's testimony, which suggested that a high level of fentanyl could render a user more aggressive. The State's brief casts doubt on Defendant's credibility, or at least his characterization of events, and devalues Dr. Valentine's testimony, noting that it was based on animal studies.

After reviewing the record and the testimony presented at trial, as well as the jurisprudence regarding self-defense, we find that even if Defendant's own testimony is accepted as credible, the current homicide does not qualify as justifiable.

In his testimony, Defendant acknowledged pulling out the knife from his belt, thus arming himself against an unarmed man who was shorter than he. Defendant testified at trial that he is "about six-foot," whereas Dr. Tape testified that the victim was five feet and nine inches tall. According to Defendant, the pair struggled to control the knife. Once Defendant secured the knife and saw an opening, he plunged the knife into the victim's neck. Although that first blow did not appear to Defendant to be immediately effective, it can be commonly understood that stabbing or slashing someone's neck is potentially lethal.

This court previously addressed a self-defense claim in *State v. Mincey*, 08-1315, p. 2–3 (La.App. 3 Cir. 6/3/09), 14 So.3d 613, 615:

Defendant does not deny that he shot and killed the victim, nor did he deny it at trial. Rather, he argues that the State failed to disprove that he acted in self-defense. Killing in self-defense is governed by La.R.S. 14:20(A), which states, in pertinent part, "[a] homicide is justifiable: (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm *and* that the killing is necessary to save himself from that danger." (Emphasis added.)

Defendant contends that the killing was justifiable because he had his back against the wall, and was surrounded by the victim and the victim's two friends, Doucet and Jones. Further, he contends that shooting the victim was the only way he could escape.

The Defendant's claim that Jones had a firearm was disputed by both Doucet and Jones at trial. The evidence given by his own mother defeats his claim of justifiable self-defense. The essence of his defense is that he was justified in responding to an attempted punch by shooting his opponent in the chest at close range. We recognize that Dejean had two friends with him. Thus, Defendant may have genuinely felt endangered; further, some level of fear was objectively reasonable. However, the level of force he used to defend himself was far beyond what was necessary under the circumstances.

In light of *Mincey*, we find that Defendant was not justified in stabbing the victim's neck in the early stages of a struggle. Even if, as Defendant testified, the victim was verbally threatening his life, Defendant deployed a "level of force" that "was far beyond what was necessary under the circumstances." *Id*. This reasoning also applies at least as strongly to Defendant's act of slitting the victim's throat. Although Defendant claimed that the act was necessary to prevent the victim from reaching a gun, there were a number of levels of force, all short of killing, that Defendant could have used to keep the unarmed victim away from the gun. In *Mincey*, the defendant had his back against a wall and was surrounded by three men. In the present case, Defendant was in no worse a situation.

We note a recent case involving La.R.S. 14:20, *State v. Coutee*, 23-1549 (La. 6/27/25), 413 So.3d 408, in which the supreme court reversed this court and thus the conviction of a defendant who shot her estranged husband and claimed self-defense.

12

The defendant in that case was in her own car when she fired the gun. Thus, in finding the jury charge to be erroneous, the supreme court relied upon the legal presumption that she reasonably believed deadly force was necessary to keep the victim from entering her car, as set forth in La.R.S. 14:20(B)[1], in conjunction with the "stand your ground" provision. La.R.S. 14:20(A)(4)(a).[2]

Defendant in the present case is not entitled to such a presumption. He was not repelling "an unlawful intruder" pursuant to La.R.S. 14:20(B). Further, as La.R.S. 14:20(A)(4)(b) explains:

> The provisions of this Paragraph shall not apply when the person committing the homicide is engaged, at the time of the homicide, in the acquisition of, the distribution of, or possession of, with intent to distribute a controlled dangerous substance in violation of the Uniform Controlled Dangerous Substances Law.

---

[1] Louisiana Revised Statutes 14:20(B) provides,

B. For the purposes of this Section, there shall be a presumption that a person lawfully inside a dwelling, place of business, or motor vehicle held a reasonable belief that the use of deadly force was necessary to prevent unlawful entry thereto, or to compel an unlawful intruder to leave the dwelling, place of business, or motor vehicle when the conflict began, if both of the following occur:

(1) The person against whom deadly force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered the dwelling, place of business, or motor vehicle.

2) The person who used deadly force knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred.

[2] Louisiana Revised Statutes 14:20(A)(4)(a) provides,

A. A homicide is justifiable:

. . . .

(4)(a) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in La.R.S. 32:1(40) when the conflict began, against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the dwelling, place of business, or motor vehicle.

There is no dispute that Defendant was at the victim's apartment to acquire controlled dangerous substances.

Thus, for the reasons discussed, we find that the State proved beyond a reasonable doubt that the homicide in this case was not committed in self-defense. As noted by the State in its closing arguments, "This is a crime scene of a man who had all the advantage and the only weapon. This was never a fight." This assignment of error lacks merit. We will proceed to the third assignment of error, as it is related to the assignment just addressed.

## ASSIGNMENT OF ERROR NUMBER THREE

In this assignment of error, Defendant argues that the verdict should have been reduced to manslaughter. On February 21, 2025, Defendant moved for a post-verdict judgment of acquittal, or alternatively, to modify the verdict to manslaughter. To support such a reduction, he cited La.Code Crim.P. art. 821(C), which provides:

> If the court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.

As evident by the text of the article, the review standard of *Jackson v. Virginia*, 443 U.S. 307, discussed earlier, is "legislatively embodied in La.Code Crim.P. art. 821." *State v. Oliphant*, 13-473, p. 11 (La.App. 3 Cir. 11/20/13), 127 So.3d 91, 98. On March 11, 2025, the trial court denied relief.

On appeal, Defendant cites *State v. Lombard*, 486 So.2d 106, 110–11 (La.1986) (footnotes omitted):

> Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La.R.S. 14:31(1). Thus, the presence of "sudden passion" or "heat of blood" distinguishes

14

manslaughter from murder. The court has stated on several occasions, however, that "sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. *State v. Tompkins*, 403 So.2d 644 (La.1981); *State v. Temple*, 394 So.2d 259 (La.1981); *State v. Peterson*, 290 So.2d 307 (La.1974). Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. Where such proof has been introduced, a second degree murder verdict is inappropriate.

More recently, this court discussed a defendant's alternative claim that his second degree murder conviction should have been reduced to manslaughter. This court had already rejected the defendant's self-defense claim, citing *Mincey*, 14 So.3d 613:

> Regarding the second assignment of error, similar reasoning applies. Louisiana Revised Statutes 14:31(A)(1) defines manslaughter:
>
> > A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]
>
> The defendant claimed before trial, and during his testimony, that as the victim backed out of the driveway, he struck the defendant with the side mirror and knocked the defendant down with the fender of the truck. The video evidence does not show this part of the event, as the camera was on the side away from where the defendant assertedly fell. However, even taking his statements on this point as true, the jury could conclude that the provocation alleged by the defendant was not sufficient to "deprive an average person of his self-control and cool reflection[.]" *Id*. Again, the undercurrent of this reasoning resembles the principle of *Mincey*, 14 So.3d 613, as normal anger or fear neither justifies nor mitigates homicide.

*State v. Dugas*, 21-85, p. 6 (La.App. 3 Cir. 5/11/22) (unpublished opinion) (2022 WL 1487006) (alterations in original), *writ denied*, 22-947 (La. 9/7/22), 345 So.3d 426.

Thus, while it is possible that Defendant became angry during the altercation with the victim, such anger does not mitigate homicide. For this reason, we find that this assignment of error lacks merit.

We now address the remaining assignments of error in numerical order.

### ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, Defendant argues that the trial court erred by denying his motion for mistrial after the State improperly commented on the exercise of his constitutional right to remain silent. Defendant acknowledges that a denial of a motion for mistrial is reviewed under the abuse of discretion standard. *State v. Ortiz*, 96-1609 (La. 10/21/97), 701 So.2d 922, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352 (1998).

Defense counsel moved for a mistrial during the State's questioning of Detective Gayle. We note the pertinent colloquy between the parties and the court:

> Q [Ms. Lex, prosecutor]  All right. So I know we kind of sped through your investigation, but there was a lot of other stuff that you-all did until you ID'd the defendant, right?
>
> A [Detective Gayle]      Yes ma'am.
>
> Q      Okay. And you were here for the defense's opening statement?
>
> A      Yes, ma'am.
>
> Q      Okay. Had you heard that side before?
>
> A      Self-defense? No, ma'am.
>
> Q      Okay. Would you have done anything different if you would have - -

16

MR. BOUSTANY, III [defense counsel]:

Judge, can we approach?

(A SIDEBAR IS TAKEN AT THIS TIME. THE FOLLOWING TAKES PLACE OUTSIDE THE PRESENCE OF THE JURY)

MR. BOUSTANY, III:

Judge, I waive Mr. Guccione's presence. The prosecutor just commented on the fact of whether my client made a statement and I was hoping she wouldn't do that. At this time I'm going to have to move for a mistrial. She has directly asked whether my client said that to the officer or not. I was terrified this would happen to be honest with you and I'm going to have to move for a mistrial, Judge. I don't know how we can unring that bell.

MS. LEX:

Your Honor, can I clarify my follow up question? It was in the defense's opening statement. And the - - so we did not go - - I asked did you get a statement, he ask [sic] for a lawyer, no. What I asked him was the opening statement, during this process of preparing for trial, right? It's not - - I did not say anything about his silence being an indication of guilt. He made a statement, right?

MR. BOUSTANY, III:

She is commenting on whether or not my client made a statement, Judge. I don't know how I unring that. We've lost credibility.

THE COURT:

Okay. We're going to break for the day and I want you both to give me some law.

MR. BOUSTANY, III:

Absolutely. Yeah.

. . . .

(ALL JURORS ARE ESCORTED OUT OF THE COURTROOM AT THIS TIME)

All jurors have exited the room.

MS. LEX:

So before Detective Gayle gets off the stand, may I proffer follow up questions and then I'll get my research? I just don't want to be accused tomorrow of like oh well you told him what to say or something.

MR. BOUSTANY, III:

Proffer? I didn't follow. Proffer?

MS. LEX:

So I'm going to ask him a line of questions - -

THE COURT:

Brent, can you shut that door please?

MS. LEX:

I would like to ask him a series of questions to clear it up before I am alone so that way I don't get told that this is - - I told him what to say, right?

THE COURT:

Okay.

MS. LEX:

And then I'll have my case law because I had follow up questions.

THE COURT:

All right. Mr. Boustany?

MR. BOUSTANY, III:

I'll hear the follow up questions.

THE COURT:

Okay. All right.

MS. LEX:

Q      So Detective Gayle, did you, after you - - after Cody was located, did you initially listen and request to any phone calls that he made?

A      Yes, ma'am.

Q      And did he state that - - were any statements made about self-defense?

A      No ma'am. He had always just advised that it wasn't him.

Q      And then what about with Emily when she testified today?

A      She said that he denied any - - having any part of it.

Q      Okay. And what about as we are, you know, preparing for court, I mean is this, hearing the defense's opening, was that the first time that you had heard the words self-defense?

A      I mean no.

Q      Related to this case.

A      I mean at the time, no. I mean at the time of the investigation, no. But, yes, I heard that that was a possible defense that was going to be brought up would be self-defense.

Q      So with the crime scene with directing for search warrants and things along those lines would it have been - - would you have done anything different?

A      So no matter if it's a natural cause death, overdose death, suicide, no matter what the death is our investigation is the entire same. The only difference that we'd possibly have would be interviews.

Q      Okay. So it doesn't change what you did or change the nature of the case?

A      That is correct. It does not change the nature of our investigation.

MS. LEX:

          No further questions.

19

CROSS EXAMINATION

BY MR. BOUSTANY, III:

Q      Detective Gayle, when my client - - when you went to do an interview with him he invoked his right to remain silent; isn't that true?

A      That is correct. Yes, sir.

Q      Okay. Commenting on my opening statement by the lead officer infringes on his right to remain silent. Wouldn't that be right?

MR. HANEY [prosecutor]:

      No. Judge, first of all, that's a legal conclusion Judge. Objection. That's a legal conclusion.

THE COURT:

      I'm going to sustain that. It's a legal conclusion.

MR. HANEY:

      It's irrelevant.

MR. BOUSTANY, III:

Q      He invoked, right?

A      He did. Yes, sir.

Q      And you just commented on that in front of the jury, right?

A      Commented on what?

Q      The fact that this is the first time you've ever heard of self-defense and all that type stuff.

A      Your opening was the first time that I've heard this defense actually put forward.

Q      I understand.

MS. LEX:

      So Your Honor, I didn't - -

20

MR. BOUSTANY, III:

He's implying that it's - -

MS. LEX:

If I was trying to comment on the defense's right to remain silent I would have said you found the defendant, you brought him in, he didn't speak to you, right? No. He invoked his lawyer. Because he - - we have this statement. I mean I'm not talking about his silence inferring guilt, but I will have case law ready in the morning, Your Honor.

THE COURT:

I want both sides to provide me law on your position.

MR. BOUSTANY, III:

Yes, ma'am.

(COURT IS IN RECESS UNTIL FEBRUARY 13, 2025)

When court resumed the morning of February 13, 2025, the trial court addressed the motion for mistrial, stating:

I've reviewed everything that has been provided by both sides, and having reviewed them all, at this time your request for mistrial is denied. I do not find that it is so prejudicial as to undermine the fairness of the proceedings. As to an admonition I do not think that it's necessary at this time. I think it would only draw more attention and possibly create more of a problem. So I am going to order the State to move on from this line of questioning. As to the questions proffered I'm also going to at this time tell you to move on from those.

Defense counsel noted his objection for the record.

On appeal, both parties cite *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240 (1976), which prohibits the use of a defendant's post-arrest silence for impeachment. At the March 11, 2025 hearing on Defendant's motion for post-verdict judgment of acquittal or new trial, his argument was also based on *Doyle*. The State, however, referred to the case *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180 (1980) at the hearing. In *Anderson*, the Supreme Court stated:

21

In *Doyle*, we held that the Due Process Clause of the Fourteenth Amendment prohibits impeachment on the basis of a defendant's silence following *Miranda* warnings. The case involved two defendants who made no postarrest statements about their involvement in the crime. Each testified at trial that he had been framed. On cross-examination, the prosecutor asked the defendants why they had not told the frameup story to the police upon arrest. We concluded that such impeachment was fundamentally unfair because *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. 426 U.S., at 618–19, 96 S.Ct., at 2245; see *Jenkins v. Anderson*, 447 U.S. 231, 239–240, 100 S.Ct. 2124, 2129–2130, 65 L.Ed.2d 86.

*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. See *United States v. Agee*, 597 F.2d 350, 354–356 (CA3) (en banc), cert. denied, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *United States v. Mireles*, 570 F.2d 1287, 1291–1293 (CA5 1978); *United States v. Goldman*, 563 F.2d 501, 503–504 (CA1 1977), cert. denied, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978).

In this case, the Court of Appeals recognized that the respondent could be questioned about prior statements inconsistent with his trial testimony. The court therefore approved the "latter portion of the above quoted cross-examination. . . ." [*Charles v. Anderson*,] 610 F.2d [417,] at 421[, 6th Cir. 1979)]. But the Court of Appeals found that "the earlier portion of the exchange" concerned the "separate issu[e]" of the respondent's "failure to tell arresting officers the same story he told the jury." *Ibid*. In the court's view, these questions were unconstitutional inquiries about postarrest silence. Thus, the Court of Appeals divided the cross-examination into two parts. It then applied *Doyle* to bar questions that concerned the respondent's failure to tell the police the story he recounted at trial.

We do not believe that the cross-examination in this case can be bifurcated so neatly. The quoted colloquy, taken as a whole, does "not refe[r] to the [respondent's] exercise of his right to remain silent; rather [it asks] the [respondent] why, if [his trial testimony] were true, he didn't tell the officer that he stole the decedent's car from the tire store parking lot instead of telling him that he took it from the street." [*People v. Charles*,] 58 Mich.App. [371], at 381, 227 N.W.2d [348], at 354 [1975]. Any ambiguity in the prosecutor's initial questioning was quickly resolved by explicit reference to Detective LeVanseler's testimony, which the jury had heard only a few hours before. The

22

questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement.

We conclude that *Doyle* does not apply to the facts of this case. Each of two inconsistent descriptions of events may be said to involve "silence" insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of "silence," and we find no reason to adopt such a view in this case.

*Id*. at 447 U.S. at 407–09 (fourth through ninth alterations in original) (footnote omitted).

Since Defendant invoked his right to remain silent after being *Mirandized*, the factual basis of the State's argument appears to stem from Detective Gayle's testimony in the State's proffer. Detective Gayle stated that in phone calls, Defendant simply denied being the killer. On appeal, the State clarifies that the phone calls were to Defendant's family. *Anderson* makes it clear that *Doyle* does not prevent the State from asking about prior inconsistent statements. Since in this case it was noted in a proffer, the jury did not hear that Defendant had denied to his family that he had any involvement in the murder. However, we note that when the State questioned Detective Gayle, the jury had already heard from Emily Warren that Defendant acted shocked when she first told him that she had heard of the murder. The jury had also heard from Warren that Defendant later denied any involvement in the murder. Thus, the State's question to Detective Gayle regarding whether he had heard of Defendant's self-defense argument before trial was a legitimate question. It related to a prior, prearrest statement that was inconsistent with Defendant's asserted defense.

For the reasons discussed, we find that the motion for mistrial was properly denied. Therefore, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

In his fourth assignment of error, Defendant argues that the jury instructions improperly shifted the burden of proof regarding factors that can reduce murder to manslaughter, thereby requiring Defendant to prove mitigation beyond a reasonable doubt rather than by a preponderance of the evidence. We note that the jury instruction given at the closing of Defendant's trial did not mention the preponderance of evidence standard. The trial court gave the following jury instructions which are pertinent to this assignment of error:

> The response[s] of lesser offenses for second-degree murder are: Guilty of manslaughter; guilty of negligent homicide; not guilty. As it applies to this case, manslaughter is a homicide which would be second-degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled or that an average person's blood would have cooled at the time the offense was committed. Thus, in order to find the defendant guilty of manslaughter, you must find that the defendant killed Leo Jack and that the defendant had a specific intent to kill or inflict great bodily harm, and that the killing was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.

> Negligent homicide is the killing of a human being by criminal negligence. Criminal negligence exists when there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under similar circumstances. In order to have criminal negligence, it is not sufficient that a person merely fail to act reasonably. The conduct must be so far below that expected of a reasonably careful person that it can be considered to be gross deviation. Thus, in order to convict the defendant, you must find that the defendant killed Leo Jack and the killing was the result of the defendant's criminal negligence.

> As I have already told you, the defendant is charged with second-degree murder. In order to convict the defendant of the offense charged, you must find beyond a reasonable doubt that the State proved every element of the offense of second-degree murder. Thus, if you are convinced beyond a reasonable doubt that the defendant is guilty of

second-degree murder, your verdict should be "guilty." If you are not convinced that the defendant is guilty of second-degree murder, but you are convinced beyond a reasonable doubt that the defendant is guilty of manslaughter, the form of your verdict should be "guilty of manslaughter."

      If you are not convinced that the defendant is guilty of second-degree murder, but you are convinced beyond a reasonable doubt that the defendant is guilty of negligent homicide, the form of your verdict should be "guilty of negligent homicide."

      If the State has failed to prove beyond a reasonable doubt that the defendant is guilty of either the offense charged or of a lesser-responsive offense, the form of your verdict as to the charge of second-degree murder should be "not guilty."

After the jury had begun deliberations, they requested the definitions of manslaughter and negligent homicide. The trial court clarified that they wanted the jury instructions read to them again, and the jury agreed. The trial court then reread the instructions quoted above for manslaughter and negligent homicide and the jury returned to their deliberations.

The State asserts that Defendant failed to object to both the original instruction on manslaughter and the trial court's rereading of the instruction at the request of the jury. Louisiana Code of Criminal Procedure Article 801(C) provides:

      A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection. The court shall give the give the party an opportunity to make the objection out of the presence of the jury.

Defendant appears to acknowledge the lack of an objection to the jury instructions when they were given at trial. However, he cites *State v. Langston*, 43,923 (La.App. 2 Cir. 2/25/09), 3 So.3d 707, *writ denied*, 09-696 (La. 12/11/09), 23 So.3d 912, for the general proposition that in the absence of a contemporaneous objection, an error can be reviewed if it affects a defendant's substantial rights.

We note, however, the case of *State v. Jeanlouis*, 96-474, p. 12 (La.App. 3 Cir. 11/6/96), 683 So.2d 1355, 1363, *writ denied*, 96-2822 (La. 4/18/97), 692 So.2d 446, in which this court stated:

> Finally, defendant asserts that the trial court erred in not instructing the jury that mitigating circumstances resulting in a finding of manslaughter need only be proved by a preponderance of the evidence. However, if no objection is made to any alleged flaws in the proposed interrogatories before the jury retires, any objection is considered waived. La.Code Civ.P. arts. 1812 & 1793; *Sampson v. Lemoine*, 94-1568 (La.App. 3 Cir. 6/30/95), 657 So.2d 181. No objection to the jury instructions was offered by the defense. We therefore find this argument to be without merit.

In light of this court's decision in *Jeanlouis* and defense counsel's failure to object to the jury instructions at the time of trial, we find that this assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER FIVE

Defendant asserts in his fifth assignment of error that the sentence of life imprisonment without benefit of parole, probation, or suspension of sentence is constitutionally excessive under the circumstances of this case.

While included in the list of Defendant's assignments of error, defense counsel failed to brief any arguments or legal authority in support of the assertion that the sentence is excessive. Nor has the State addressed this assignment of error in its opposition.

Uniform Rules—Courts of Appeal, Rule 2-12.4(B)(4) provides, "[a]ll assignments of error and issues of review shall be briefed. The court may deem as abandoned any assignment of error or issue for review which has not been briefed." Thus, for the foregoing reasons, we consider this assignment of error abandoned and will not address it.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed. The trial court is instructed to correct the Uniform Sentencing Commitment Order to include the length of Defendant's sentence as well as the denial of parole, probation, or suspension of sentence.

**AFFIRMED, WITH INSTRUCTIONS.**